[Civ. No. 28574. Second Dist., Div. Three. Oct. 11, 1966.]

ELIZABETH S. DAVIES, as Executrix, etc., Plaintiff and Appellant, v. NORMAN KRASNA, Defendant and Respondent.

Max Fink, Stanley C. Poster, Jerome Janger, Richard J. Hirsh and Sidney M. Wolf for Plaintiff and Appellant.

Mitchell, Silberberg & Knupp and Arthur Groman for Defendant and Respondent.

Loeb & Loeb, John L. Cole and Alfred I. Rothman as Amici Curiae on behalf of Defendant and Respondent.

FORD, J.—The appellant is the executrix of the estate of Valentine Davies, deceased. Mr. Davies filed the action but died before it came to trial. He sought damages for an alleged breach of an implied contract with respect to the use by the defendant, Norman Krasna, of an idea, central theme and dramatic core of a story which Mr. Davies alleged that he had created and thereafter submitted to the defendant. In a second cause of action Mr. Davies sought damages for an alleged breach of trust or confidence with respect to the use which he claimed Mr. Krasna made of his idea.

In the joint pretrial statement, which was made a part of the pretrial conference order, it was stated that plaintiff "contends that Valentine Davies submitted the said story 'Love Must Go On' to defendant on or about December 6, 1951 upon condition that defendant agree to pay plaintiff the reasonable value of said dramatic core or central theme in the event defendant made use thereof." It was also stated that plaintiff "contends further that there existed, at the time of said submission of said material by Valentine Davies to defendant, certain customs and usages with respect to the offering and sale of ideas, central themes and dramatic cores, and that there existed at the time of Valentine Davies' submission of defendant's use [sic] of the said idea, central theme and dramatic core a relationship of trust and confidence between Valentine Davies and defendant, and that defendant breached said relationship of trust and confidence by using the said idea, central theme and dramatic core of said story of Valentine Davies without compensating him therefor."

In the first trial the defendant's motion for a nonsuit was granted as to the second cause of action and the jury was unable to reach a verdict as to the first cause of action. In the second trial the jury returned a verdict in favor of the defendant and judgment was entered accordingly.

The first question to be resolved is whether there is a final judgment of an appealable nature before this court. In the first trial, pursuant to the court's statement that it would "grant the motion of nonsuit to the second cause of action," an entry was made as follows in the minutes of the court for February 26, 1962: "Defendant's motion for judgment of nonsuit or for judgment of dismissal on plaintiff's first and second causes of action is argued and granted as to the second cause of action and denied as to the first cause of action." In the "Judgment on Verdict in Open Court" entered on December 20, 1963, no specific reference was made to the nonsuit as to the second cause of action but, after setting forth the verdict rendered on the second trial, it was stated that "it is ordered, adjudged, and decreed that said plaintiff take nothing by reason of her complaint" and that the defendant Norman Krasna have and recover his costs from the plaintiff. The conclusion that no final judgment was entered finds support in the reasoning of *Murphy* v. *Fong Shuck,* 151 Cal. App.2d 64, at page 69 [311 P.2d 80]: "The document entitled 'Judgment' and filed July 13, 1955, is not a final judgment. It did not purport to embrace a final disposition of the entire cause. By its express terms, it was confined to the three counts that had been submitted to the jury. It erroneously failed to include a recital with respect to the disposition of the other counts as to which nonsuits had been granted. Being so expressly confined to mere recitals of the jury action upon the three counts submitted to the jury and not purporting to make disposition of the counts that had been subject to nonsuit, it cannot be held to have affected those counts."

The difficulty thus presented can, however, be surmounted by resort to the reasoning of *Shepardson* v. *McLellan,* 59 Cal.2d 83, 87-89 [27 Cal.Rptr. 884, 378 P.2d 108]. Accordingly, on this court's own motion, in the interest of justice the judgment entered on the jury verdict should be ordered amended so as to include the order granting a nonsuit as to the second cause of action, and the premature notice of appeal should be treated as a notice of appeal from the judgment on the jury verdict as so amended. (See *Kennedy* v. *Bank of America,* 237 Cal.App.2d 637, 643 [47 Cal.Rptr. 154].)

We turn to the question of the propriety of the granting of a nonsuit as to the second cause of action and, for that purpose, make reference to pertinent portions of the evidence introduced at the first trial. Mr. Davies' story entitled "Love Must Go On" was registered with the Screen Writers Guild on November 28, 1951. The earlier version entitled "The Language of Love" was registered with the guild on December 30, 1941. Each story was read to the jury. Mr. Krasna's play entitled "Who Was That Lady I Saw You With?" was also read to the jury.[1] Mr. Gordean, a motion picture agent affiliated with Famous Artists Corporation, testified that Ned Marin had been connected with that agency for a number of years prior to his death in 1955. Mr. Marin handled the affairs of Valentine Davies. The records of the agency showed that it received the story entitled "Love Must Go On" on December 3, 1951, and that a copy thereof was sent to Jerry Wald on February 14, 1952. That copy was not returned to the agency. The files of the agency contained a copy of a letter addressed to Mr. Wald under the date of December 6, 1951.[2] Apparently another copy of the story was submitted to Mr. Wald on March 27, 1952, and not thereafter returned.

Mr. Gordean further testified that in approximately November of 1954 Mr. Krasna, the defendant, talked to him concerning a story that he had which was entitled either "Jack of Spades" or "Who Was That Lady?", and was about a man who became involved with the F.B.I. But Mr. Krasna did not show him anything in writing with respect to the particular theme. On cross-examination Mr. Gordean stated that he had never read Mr. Davies' story entitled "Love Must Go On." He did mail a letter dated December 14, 1954, to Bob Hope's representative in which he stated: "Here is a copy of the Norman Krasna treatment."

---

[1]Before reading to the jury Mr. Davies' story entitled "Love Must Go On," the plaintiff's attorney stated: "I should comment, and only comment briefly with respect to the story, that it is of course not offered for the treatment and particularization of scenes, plots and characters, but as, in the original, and as it will be with Mr. Krasna's play when we read it, only for the central theme, core and idea."

[2]The body of the letter was as follows:

"Dear Jerry:

Here's Val Davies' story, as promised, for your confidential consideration, at this time.

Please let me have your reaction at your convenience.

Most sincerely,
Ned Marin"

A notation was contained thereon to the effect that a copy of the story entitled "Love Must Go On" was enclosed.

The copy of the letter was received in evidence without objection.

William Ludwig, a screen writer who was called as a witness on behalf of the plaintiff, was asked whether there was "a custom or tradition amongst writers with respect to the revealing of their ideas or themes or central cores or themes or ideas to one another." The defendant's objection was sustained. Thereupon counsel for the plaintiff made an offer of proof that there was a custom in the motion picture business whereby, when stories and their central themes and dramatic cores were submitted to producers, there was an understanding and agreement that such submission was for a limited and confidential purpose and that use would not be made thereof unless there was appropriate payment by the producer. A similar question was asked of the witness George Seaton, a writer, director and producer of motion pictures, and, upon an objection thereto being sustained, a similar offer of proof was made.

The testimony of Lester Townes Hope, also known as Bob Hope, was introduced by means of his deposition which had been taken on June 17, 1961. He had known both Mr. Davies and Mr. Krasna for some years. About two years before the date of his deposition he discussed the story "Who Was That Lady I Saw You With?" with Mr. Krasna. He did not remember having had any discussions about the story in approximately 1954 with Jack Gordean or Bob Burns or anyone else. He did not recall that he ever talked to Louis Shurr about the story. He did not remember whether he had a meeting with Mr. Krasna in 1940 concerning the story which was "generally" contained in the play called "Who Was That Lady?"

Jerry Wald's testimony was given at the trial by means of his deposition which had been taken on November 16, 1960. In 1948 he formed a business association with Mr. Krasna, Wald-Krasna, which was a corporation. They were the controlling stockholders. Mr. Wald described their respective functions as follows: "A. Well, my general operation was to run the show and Krasna's operation was to follow up on scripts, work with the writers on the scripts, so that I was really carrying the ball. That is, on all future projections. He was taking the actuals, whatever we had in work. If it was a picture like the 'Blue Veil' or 'Behave Yourself' his major job was to concentrate on the work that was in progress, in work. I handled most of the projections. Q. Did both of you evaluate proposed story materials? A. No. Q. Did Mr. Krasna evaluate proposed story materials? A. No. Q. Did you discuss with Mr.

Krasna story materials which were submitted to you? A. If I liked them, . . .''

Mr. Wald further testified that during the existence of Wald-Krasna hundreds of ''properties'' were submitted to him for his appraisal as potential motion pictures, the submission being made sometimes directly by writers but ''99 per cent of the time they were submitted by agents.'' If he liked a particular property submitted and ''saw ways of casting it,'' he would give it to Mr. Krasna to read and then ask him what he thought could be done with it. Mr. Wald had been a writer prior to becoming a producer in 1940.

Another portion of Mr. Wald's testimony was as follows: ''Q. Do you recall during the existence of Wald-Krasna that a story by Valentine Davies entitled 'Love Must Go On' was submitted to you through his agents, the Famous Artists? A. I only recalled that when Valentine Davies brought it to my attention because, as I indicated earlier, in the two years that I was at RKO there was a minimum of 50 to 100 stories submitted a week from all over the country, from agents all over the country, and Mr. Davies brought this to my attention and I did recall. . . . I told him I recall his giving me a story and I think I returned it. He told me his agent had acknowledged a receipt of the returned script to the agency, Ned Marin.'' Mr. Wald further testified that he presently recalled that a story of Mr. Davies was sent to him through Ned Marin, and that the story concerned the general subject matter of a man caught in a compromising position by his wife and who, in order to divert her thoughts, pretended to be an ''FBI'' agent. He did not hear about the play ''Who Was That Lady?'' during the period in which he was making motion pictures in the Wald-Krasna organization. He could not recall that Mr. Krasna ever related the plot of the story which became ''Who Was That Lady?'' while Wald-Krasna was in existence. He did not recall a meeting with Mr. Davies and Mr. Krasna at which Mr. Davies' story entitled ''Love Must Go On'' was discussed. His recollection was that he was never present at any meeting between Valentine Davies and Norman Krasna at his office, or at any other office, and that he never told Mr. Krasna or communicated to him in any way the Davies story concerning the ''FBI.'' He never discussed Mr. Davies' story with Mr. Krasna. Mr. Wald further testified that he assumed that Mr. Krasna had complete access to all the files and story materials at Wald-Krasna.

As has been noted, Mr. Davies died prior to the first trial. His testimony was received in evidence by means of his deposi-

tion which had been taken on July 11, 1959. His occupation was that of a writer. He wrote the first version of his story in the fall of 1941, "using the same basic idea" as he used in the later version which was registered with the Screen Writers' Guild on November 28, 1951. He did not personally submit his story to Mr. Krasna and no agent did so. There was a submission by means of the letter of December 6, 1951. (See footnote 2 of this opinion.) A portion of Mr. Davies' testimony was: "Actually I only know that the story was mimeographed about a week prior to this, and that Ned [Marin] told me that he understood that Wald-Krasna were looking for properties, and that he was sending it to them. Q. BY MR. GROMAN [attorney for defendant Krasna] : When you say 'Wald-Krasna,' you are referring to a corporation. Is that correct? A. Yes. Q. You have no explanation as to why the phrase 'confidential consideration' was included in the letter? A. I have a vague recollection that the intent of this was that the Famous Artists subsequently intended to and did submit this generally to all the studios, and that—I can't swear to this absolutely—but it is my recollection that Jerry had called Ned and asked him for properties, and that he had submitted this to Jerry prior to a general submission to all the studios, and that confidential in that sense was meant in the sense that he did not want to offend story editors or producers at other studios by indicating that he had given Jerry the first crack at the story."

Mr. Davies further testified that, as he recalled, there were two other submissions to "Jerry Wald, Wald-Krasna," one of them being on February 14, 1952, and another on March 27, 1952. Mr. Marin called him and said that "they" were not interested in the story, but were interested in having him develop another story. An appointment was made for a meeting and both Mr. Wald and Mr. Krasna were present at the meeting, the date of which Mr. Davies was unable to fix. Mr. Davies related the conversation at that meeting: "Mr. Wald and Mr. Krasna had read my story, 'Love Must Go On,' and they found it reasonably amusing, but they had too many, they had already purchased more properties than they felt they could handle at the time, and they were not interested in purchasing it. I remember vaguely they said they had a similar light farce comedy, which was another reason they didn't want to buy it. But on the strength of it they were interested in me to write a screenplay on a story called, 'Size Twelve,' . . . then I said I would be glad to take the story and read it, and I read the story. . . . That was all there was to the inter-

view. They gave me a copy, as I recall, of it, a mimeographed treatment form of story.'' Another portion of Mr. Davies' testimony was: ''Q. By Mr. Groman: Tell us particularly what Mr. Norman Krasna said, if anything, concerning 'Love Must Go On' during this interview we have been talking about? A. I can't recall any specific statements. Q. Did Mr. Krasna at any time state that he had read it? A. I can't recall his making a specific statement, . . . the gist of the conversation was that having read this material, they thought I would be a good person to dramatize or to do a screenplay of the story. Q. Was your script or story of 'Love Must Go On' present during the interview? A. No. I don't think so. . . . Q. And to the best of your recollection Mr. Krasna never said in your presence that he had read 'Love Must Go On.' Is that correct? A. No, it is not correct. He might very well have said it, but I don't remember whether he said it or not, at this late date. Q. But as between them it wasn't stated by Mr. Krasna that he had read it or that Mr. Wald had read it, was it? . . . The Witness: I am trying to tell you I can't remember a specific statement either way on either one of their parts. I couldn't under oath say that Mr. Krasna said, 'I have read your story,' or that Mr. Wald said, 'I have read your story,' but I have a distinct memory that they said: 'Having read your story, we are interested in you for this other property.' ''

The defendant Norman Krasna was called as a witness pursuant to section 2055 of the Code of Civil Procedure. He testified that in the period of 1950 to 1952 he was associated with Jerry Wald in a business enterprise known as Wald-Krasna Productions. He and Mr. Wald were the principal owners of the enterprise. Mr. Krasna had been writing motion pictures and plays during his entire adult life. A year after he left the Wald-Krasna organization, it was sold to Columbia Pictures. Mr. Krasna further testified that he and Mr. Wald were both executives of the company. He stated that they had ''equal authority, but different functions.'' Part of his testimony was: ''Q. Did you ever discuss stories which had been submitted to Mr. Wald or to Mr. Krasna or to Wald-Krasna? A. Yes, sir. Q. It's a fact, isn't it, Mr. Krasna, that both you and Mr. Wald purchased stories on behalf of Wald-Krasna? A. Yes, sir. . . . Q. Mr. Krasna, it's true, is it not, that at no time while you were in association with Mr. Wald at Wald-Krasna Studios, that you told him the story outline or the story of ''Who Was That Lady I Saw You With?'' A. That's true. Q. While you were in executive capacity at Wald-Krasna,

part of your activity was a search for materials suitable for use as motion pictures or in motion pictures, is that true, sir? A. No, sir. . . . A. . . . I meant me personally. . . . Q. And included among the things that Wald-Krasna did as a company was to attempt to find story materials or stories or properties which would be made into motion pictures, is that correct? A. Yes, sir. . . . Q. When you were at Wald-Krasna, did you from time [sic] speak with or interview or have conferences with . . . writers or agents respecting properties? A. Never agents. Q. Sometimes with writers? A. If they were channelled through Mr. Wald. Q. Sometimes Mr. Wald would get a story and then you would see either the story or the writer, is that correct? A. It would be the only way, sir. . . . Q. Do you recall a meeting at which time you and Mr. Wald and Mr. Davies were present, at which time Mr. Davies' story, 'Love Must Go On,' was discussed? A. No, sir. Q. Do you deny that any such meeting ever took place? A. Yes, sir. Q. And is it fair to say, Mr. Krasna, that it is not simply a matter that you don't remember such a meeting, that you say absolutely that no such meeting ever took place? A. Yes, sir. Q. With respect to . . . 'Love Must Go On?' A. Yes, sir. Q. Is your answer the same with respect to any property or story or story idea created by Mr. Davies? A. Yes, sir. Q. Did you, prior to 1951, let us say, know Mr. Davies personally? A. No, sir.'' He never met Mr. Davies until his deposition was taken on July 11, 1959.

A further portion of Mr. Krasna's testimony was as follows: ''Q. At any time prior to the time you reduced 'Who Was That Lady' to written form, had you ever seen Mr. Davies' story, 'Love Must Go On,' either the document which is before you or a copy of it? A. Yes, sir. . . . A. It was given to me by Famous Artists who were my agents at the time. Q. When did that happen? A. In 1954. . . . A. It was given to me by Mr. Gordean or Mr. Marin, or together, or a secretary. It was sent to my secretary, who has an office in the same building. And there is where I read it and there is where I retained it. . . . A. I have seen a notation, and I remember from my own memory that Mr. Marin mentioned there was such a story. I asked for it. I read it. I said to Mr. Marin, 'This is no similarity to mine, and since mine is earlier and I don't consider them close enough, I have no objection to Mr. Davies trying to sell his story.' '' Another portion of Mr. Krasna's testimony was: ''Q. . . . and what I am asking you, sir, is, isn't it a fact that before you ever put a word down on

paper for 'Who Was That Lady I Saw You With,' you had read Mr. Davies' story and had discussed it with Mr. Marin? A. Yes.''

It is necessary to consider carefully the amended complaint and the pretrial conference order for the purpose of setting in proper focus the contention that the trial court erred in granting a nonsuit with respect to the second cause of action. Portions of the second cause of action were as follows: 1. As was well known to defendant Krasna, Valentine Davies was a professional writer in the motion picture, radio and television fields and was represented by an established ''theatrical literary agency,'' Famous Artists Corporation. 2. In or about December 1951, defendant Krasna was an officer, director and shareholder of Wald-Krasna Productions, a corporation engaged in the production of motion pictures. 3. During all of the times mentioned in the complaint, there existed in ''said [entertainment] trade and profession, a practice and custom whereby writers would present and submit stories to producers for the purpose of use and adaptation insofar as said stories and their central themes and dramatic core concepts are concerned for motion picture and other dramatic productions, with the understanding and agreement that said submission was for the limited and confidential use of the said producers and the persons to whom said stories were submitted for possible purchase of the right to use said stories and their central themes or dramatic core concepts for adaptation and use in the making of motion pictures and other dramatic productions.'' 4. ''On or about December 6, 1951, plaintiff, pursuant to said trade practice and custom and for the limited and confidential uses and purposes as hereinabove set forth, submitted plaintiff's said story to defendant and disclosed and entrusted to defendant for said limited and confidential use and purpose only, plaintiff's said central theme and dramatic core concept, and defendant received and accepted said submission for the limited purposes for which it was submitted, and under the confidential relationship as hereinabove set forth, and with a full understanding thereof on defendant's part.'' 5. The central theme and dramatic core concept were submitted ''to the defendant in full trust and confidence and in the belief and reliance on the part of plaintiff in the integrity of defendant and that said submission and disclosure would be so received and accepted.'' 6. Thereafter defendant, ''in violation of defendant's relationship to plaintiff of trust and confidence, understanding and agreement, as aforesaid, and in

wilful and deliberate disregard and breach thereof, and in violation of said agreement and plaintiff's rights thereunder and without the knowledge, authority or consent of plaintiff, defendant knowingly used and adapted plaintiff's said central theme and dramatic core concept, incorporated the same into a dramatic production, to-wit, a play entitled: 'WHO WAS THAT LADY I SAW YOU WITH'...''

In the pretrial conference order reference was made to the second cause of action as one "for compensatory and exemplary damages for alleged breach of trust with respect to the alleged use by the defendant of the idea." The joint pretrial statement was made a part of the order. In that statement it was stated that the plaintiff "pleads also a relationship of trust and confidence between Valentine Davies and defendant, and a wilful breach thereof giving rise to a right to punitive damages" and that the second cause of action was "based upon an alleged breach of trust with respect to the alleged use by defendant of the said idea." Other portions of the joint pretrial statement have been set forth in the second paragraph of this opinion.

There appears to be no clear precedent by means of which the theory of breach of confidence can be readily applied to the evidence introduced by the plaintiff at the first trial. Some guidance, however, is found in the reasoning of Dean Havighurst: "Use by one to whom an idea has been disclosed in confidence is the usual basis of liability in the trade secret cases. It has perhaps less significance for the kinds of ideas with which we are here concerned. But breach of confidence is a possible theory of recovery in the case of unauthorized use of ideas other than trade secrets. . . . It must be made clear that a confidential disclosure cannot be predicated merely upon the statement of the originator that he is submitting his idea in confidence. Either there must be a pre-existing relation of trust and confidence, such as that of employer and employee, or the person to whom disclosure is made must agree to hold the idea in confidence and at least impliedly agree not to use it or disclose it to others. In this latter aspect the confidence is based upon contract, although it will be noted that it is not a contract to pay but rather a contract not to use." (Havighurst, *The Right To Compensation for an Idea* (1954) 49 Nw.U.L.Rev. 295, 311-312.)

Another legal writer has expressed his views as follows: "The courts will sometimes protect a plaintiff's idea on the

theory of breach of confidential relationship. Such protection is akin to the traditional protection which equity will afford to a trade secret. However, an idea may not be wholly secret but only qualifiedly so and still command protection. The cases are by no means clear as to when a confidential relationship exists so as to render a defendant liable if he uses plaintiff's idea. Traditionally such a relationship exists between an employer and an employee with respect to secret ideas and processes. However, even where an employer-employee relationship does not exist courts will tend to find a confidential relationship when the parties deal on unequal terms resulting in one party reposing trust and confidence in the other's good faith. . . . Some courts regard a confidential relationship action as being based upon an express or implied agreement of the defendant to treat the idea disclosed in confidence. Certainly it is true that if a defendant expressly or impliedly agrees to treat plaintiff's idea in confidence, and then proceeds publicly to disclose the idea, he has acted in breach of contract. However, other courts go still further and regard the unauthorized disclosure of an idea submitted in confidence as justifying a remedy in equity entirely apart from any contract theory. Under this view a breach of confidential relationship action is usually equated to an action in quasi contract for unjust enrichment, even if under the given facts an express or an implied contract might also be upheld. . . . But the determination of whether a confidential relationship action sounds in contract or equity may be most significant with respect to the nature of the ideas which will be protected. Thus, if it is held that a relationship is confidential because of an express or implied agreement by the parties (and this includes an employment relationship) then there is no reason why a completely abstract idea should not be protected. . . ." (Nimmer, *The Law of Ideas* (1954) 27 So.Cal.L.Rev. 119, 138-140.)

In *Thompson* v. *California Brewing Co.*, 150 Cal.App.2d 469 [310 P.2d 436], the court held that the third count of the complaint in that case was sufficient to plead a violation of confidence reposed by the plaintiff in the defendants. The court said at page 475: ''Here, plaintiff has alleged the voluntary assumption of such a relationship by the defendants. Why might they not have assumed such a relationship? If the evidence should show they were looking for 'ideas' and that plaintiff undertook to supply several such upon the condition that they be not disclosed or used without his consent, why

should there not ensue a duty to that effect?" (See also Nimmer on Copyright, § 171.)

In *Desny* v. *Wilder*, 46 Cal.2d 715, the Supreme Court stated at page 734 [299 P.2d 257] : "The person who can and does convey a valuable idea to a producer who commercially solicits the service or who voluntarily accepts it knowing that it is tendered for a price should likewise be entitled to recover." As expressed in *Chandler* v. *Roach*, 156 Cal.App.2d 435, at pages 440-441 [319 P.2d 776] : "The essential elements of an implied-in-fact contract and an express contract are the same, namely, mutual assent and consideration. In a case such as the one before us, the assent of the writer is found in his submission of the idea or material to the producer, with the reasonable expectation of payment which can be inferred from the facts and circumstances. The assent of the producer is manifested by his acceptance of the idea or material submitted under the circumstances, a part of which is that it is reasonably understood that a professional author expects payment of the reasonable value of the idea or material, if used, so that the conduct of the producer in accepting it implies a promise to fulfill those reasonable expectations."

 In the present case the evidence was sufficient to support an inference that Mr. Davies, through his agent, submitted his idea to Jerry Wald with the reasonable expectation that he would be paid if his idea was used. The evidence was also sufficient to support the further inference that Mr. Wald, acting for Wald-Krasna Productions, Inc., accepted the submission of the idea with full awareness of the expectation of such payment in the event of use thereof. Consequently, there was a sufficient basis for a determination of the existence of a contract implied in fact for compensation upon use in accordance with Mr. Davies' expectation.

 Clearly, whatever duty of confidence was imposed upon Wald-Krasna Productions, Inc., with respect to the use of the Davies story was also binding upon Mr. Wald and Mr. Krasna as officers of that corporation. Implicit in an agreement of the nature of that herein involved is the obligation to guard the idea so submitted from disclosure to third persons by any act or omission on the part of the corporation, its officers or employees. (Cf. *Hoeltke* v. *C. M. Kemp Mfg. Co.* (4th Cir. 1935) 80 F.2d 912, 923.) A violation of that duty would constitute a breach of confidence. (See *Thompson* v. *California Brewing Co., supra,* 150 Cal.App.2d 469, 474-

476; *Hollywood M. P. Equipment Co.* v. *Furer,* 16 Cal.2d 184, 188-189 [105 P.2d 299] ; *Ojala* v. *Bohlin,* 178 Cal.App.2d 292, 299-300 [2 Cal.Rptr. 919].) There would obviously be such a breach on the part of any officer of the corporation who made use of the idea for his own personal purposes or gain.

■ The evidence which has been related hereinbefore was sufficient to sustain an inference of access by Mr. Krasna to Mr. Davies' manuscript. (See *Kovacs* v. *Mutual Broadcasting System,* 99 Cal.App.2d 56, 64 [221 P.2d 108].) The claimed similarity of the basic idea of Mr. Davies' story and that of Mr. Krasna's play was based on the presence in each of a pretense on the part of a husband that he was working for the Federal Bureau of Investigation as a means of diverting his wife's thoughts from her initial surmise as to the nature of his suspicious conduct. (Cf. *Kurlan* v. *Columbia Broadcasting System,* 40 Cal.2d 799, 810 [256 P.2d 962].) Consequently, there was an issue of fact as to whether, in breach of his duty as heretofore stated, Mr. Krasna had improperly made use of Mr. Davies' idea for his personal purposes. (See *Teich* v. *General Mills, Inc.,* 170 Cal.App.2d 791, 797-798 [339 P.2d 627].) ■ ■ ■ ■ Under the governing law,[3] the nonsuit was improperly granted as to the second cause of action.

A summary of the evidence at the second trial which is pertinent to the determination of the issues presented on this appeal will be given. An employee of the Writers Guild of America testified as to the method of registration of literary material employed by that organization. She stated that the material to be registered was placed in a sealed envelope which remained in the possession of the guild until it was either withdrawn by the writer or destroyed. On December 30, 1941, there was a registration of ''The Language of Love.'' Another registration was made under the date of November 28, 1951, with respect to a document entitled ''Love Must Go On,'' a story by Valentine Davies.

Mrs. Davies, the widow of Valentine Davies, testified that in the fall of 1941 Mr. Davies started to work on a story or treatment which was entitled ''The Language of Love'' and

---

[3] ''We may affirm a judgment of nonsuit only when, from a review of the evidence, we can say that, disregarding the fact that there may be a conflict therein, and giving full credit only to that portion of the evidence, whether produced by plaintiff or defendant, which tends to support the allegations contained in plaintiff's complaint, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict for plaintiff if such verdict were given.'' (*Kersten* v. *Young,* 52 Cal.App.2d 1, 7 [125 P.2d 501].)

which story, in a later version, became known as "Love Must Go On." That later version was read to the jury. At a subsequent point in the trial, defendant Krasna's play entitled "Who Was That Lady I Saw You With?" was read to the jury.

The testimony of Valentine Davies was given to the jury by means of his deposition which had been taken prior to the filing of the action. Reference to pertinent portions thereof has heretofore been made in this opinion.

The copy of the letter of December 6, 1951, addressed to Jerry Wald, which copy was part of the records of Mr. Davies' agent, Famous Artists Corporation, and the content of which is set forth in footnote 2 of this opinion, was received in evidence and read to the jury. Mr. Marin was one of the executives of Famous Artists Corporation.

The deposition of Jerry Wald, who died prior to the second trial, was read to the jury. Reference to pertinent portions thereof has heretofore been made in this opinion.

Mr. Gordean, who testified at the first trial, was absent from the jurisdiction at the time of the second trial. Testimony given by him in his deposition and at the first trial was received in evidence. In an earlier portion of this opinion reference has been made to Mr. Gordean's testimony at the first trial.

The defendant Norman Krasna was called as a witness by the plaintiff pursuant to the provisions of section 2055 of the Code of Civil Procedure. He testified that he and Jerry Wald formed Wald-Krasna in 1950. Prior to that time Mr. Krasna had been a producer and director, but his primary activity had been that of writing. Mr. Wald had been a producer since 1933 and, before that, a writer. The Wald-Krasna organization had a permanent staff of six or eight people, including Mr. Wald and Mr. Krasna. Mr. Krasna looked at stories only when Mr. Wald "channeled" them to him. Approximately one hundred stories were so "channeled." Wald-Krasna Productions bought about a dozen stories, all of which Mr. Krasna saw. He did no writing while he was with Wald-Krasna. No story was purchased prior to a conference between Mr. Wald and Mr. Krasna. Most of the one hundred stories came from agents and Mr. Krasna understood that they were presented for the purpose of sale.

Mr. Krasna further testified that he signed an agreement dated February 12, 1952, entitled "Supplemental Agreement between Wald-Krasna Productions, Inc., and Norman Kras-

na,'' one portion of which was as follows: ''The property or properties with reference to which you shall render the additional services herein referred to shall be subject to our mutual approval, it being understood and agreed that we shall both use our best efforts to select and obtain such property or properties.'' He was then being paid a salary and allowed an expense account by Wald-Krasna Productions, Inc., a corporation. Mr. Wald and Mr. Krasna each invested $22,500 in the corporation and the lawyer for the corporation invested $5,000. Mr. Krasna and Mr. Wald had equal authority. Mr. Krasna never talked to Valentine Davies about writing a screen play for a story called ''Size Twelve.''

Mr. Krasna also testified that he understood that he could not take any ideas from the stories submitted for sale unless he bought them. He started to write the play entitled ''Who Was That Lady I Saw You With?'' in 1956. There was reference to an ''FBI'' story in Mr. Krasna's 1954 calendar. There was a step treatment of his story in 1954 which was sent to Bob Hope's agent. Mr. Krasna defined a step treatment as follows: ''A step treatment is the recording of the sequences to be used in a scenario encompassing in varying degrees of elaboration the characters, the motivations and the theme of a final motion picture.'' He finished the step treatment on the day on which it was dated, December 8, 1954. In it he substituted ''OSS'' for ''FBI.'' His calendar for that date contained the following notation: ''Finished FBI treatment.'' A notation for December 4 was: ''Worked on FBI story.'' There were other notations about an ''FBI'' story for certain days in September and November, and in December prior to December 8. A notation for November 1 was that he started the ''play version of FBI story'' on that day, which, it was Mr. Krasna's ''guess,'' was the actual beginning of the ''typing work on it.'' Before he began to write his story his secretary obtained a copy of the story by Mr. Davies entitled ''Love Must Go On,'' which had been registered with the Screen Writers Guild on November 28, 1951, and he read it. He had it in his possession when he wrote the step treatment. Prior to the time he obtained that copy he sold his share in the corporation, Wald-Krasna Productions. He did not use ''OSS'' in the step treatment for the purpose of concealing the fact that he had taken the basic idea of Mr. Davies' story. He never discussed an ''FBI'' story with Jerry Wald.

Mr. Krasna's explanation of how he happened to use ''OSS'' rather than ''FBI'' was as follows: ''There was in

the newspapers at that time some stories of the activities of the Office of Strategic Services which was headed by Colonel Wild Bill Donovan, and I thought it so attractive and odd and new that I thought it would be a novelty to update the story by using the Office of Strategic Services rather than the FBI. If I had done the story today, I believe I would use CIA, Counter [*sic*] Intelligence Agency.''

Under examination by his own counsel Mr. Krasna testified that Mr. Wald never showed to him a manuscript of Mr. Davies' story entitled ''Love Must Go On'' in the years 1951 and 1952 while Mr. Krasna was with Wald-Krasna. During that period of time Mr. Wald did not orally tell him the contents of the story submitted by Mr. Davies. Mr. Wald never discussed that story with him. Mr. Krasna testified that the supplemental agreement he made with the corporation was for the purpose of having him assume the role of writer and director rather than that of producer. But shortly thereafter he departed for Europe and on his return he tendered his resignation from the company, so that the supplemental agreement never had any practical effect. He left for Europe on March 24, 1952, after having stayed in New York for 10 days, and returned to New York on April 22. He came back to Los Angeles the next day and did not resume his duties at Wald-Krasna Productions, Inc. Mr. Krasna testified that he never met Mr. Davies until he went into the law office where Mr. Krasna's deposition was taken on July 11, 1959. He never talked to Mr. Davies at any time while he was with Wald-Krasna Productions, Inc., in 1951 or 1952 about the story entitled ''Love Must Go On'' or about the story entitled ''Size Twelve.'' He never had any discussion with Mr. Davies.

Mr. Krasna further testified that the ''FBI'' story to which he referred in his 1954 calendar (commencing with an entry of August 10) was a story that he subsequently used in the play ''Who Was That Lady?'' At the meeting at Mr. Hope's house as to which Mr. Gordean testified, he told the story which is in that play. On occasions Mr. Krasna sold his stories by telling them and in such instances he did not reduce his stories to writing before telling them.

With respect to the copy of Mr. Davies' story ''Love Must Go On'' which Mr. Krasna's secretary obtained for him, Mr. Krasna testified that that copy was received by him on October 21, 1954, from the Famous Artists agency. As to the circumstances under which he asked that agency to permit him to see a copy of Mr. Davies' story, Mr. Krasna testified as follows:

''When I told Mr. Desi Arnaz the plot of my story, which became 'Who Was That Lady I Saw You With,' he told me that Famous Artists had submitted another FBI story through Ned Marin, who was my agent. I asked Mr. Marin to give me Mr. Marin's [Davies'] story.[4] He did. I read it. . . . And I said to Mr. Marin, 'You may continue submitting Mr. Davies' story. . . .' '' In response to an inquiry as to whether, prior to the year 1954, he had ever orally presented the story ''Who Was That Lady?'' or the substance of it, Mr. Krasna testified that he had. He stated that in August of 1940, while he was on his honeymoon and was at the Hotel Pierre in New York, he received a communication from Louis Shurr in which he was asked if he had any stories for Bob Hope. When Mr. Krasna returned to Beverly Hills the following week, he related the plot and story that subsequently became the stage play entitled ''Who Was That Lady I Saw You With?'' Mr. Shurr brought Bob Hope to Mr. Krasna's home and Mr. Krasna related the plot and story to Mr. Hope. At that time the hero was an entertainer at the World's Fair and, Mr. Krasna testified, ''it suited the personality of Mr. Hope at that stage of his career to be an entertainer.'' He also told the story to Edward Buzzell ''during its creation.''

Mr. Krasna further testified that apart from the occasion in 1954 when he obtained a copy of Mr. Davies' story entitled ''Love Must Go On'' from the agency, neither Mr. Davies nor anyone on his behalf ever submitted or disclosed to Mr. Krasna the idea or contents of that story. He never saw a manuscript thereof in the years 1941 to 1953 and in that period of time no one related the contents thereof to him. He never used the essential theme, dramatic core or idea of that story in his play entitled ''Who Was That Lady I Saw You With?'' He independently conceived the idea, theme and dramatic core of that play in the year 1940 or prior thereto.

Counsel for the plaintiff read to the jury Executive Order No. 9621 of the President of the United States, dated September 20, 1945, which related to the termination of the Office of Strategic Services and the disposition of its functions and was effective, except as otherwise specifically provided therein, as of October 1, 1945.

The deposition of Lester Townes Hope, also known as Bob Hope, was read to the jury as part of the plaintiff's case.

---

[4]Thereafter Mr. Krasna testified as follows: ''Q. BY MR. GROMAN [attorney for defendant Krasna]: Now, Mr. Krasna, you said, I believe, you asked for Mr. Marin's story. A. Excuse me. I certainly meant Mr. Davies' story.''

Reference to pertinent portions of that deposition has heretofore been made in this opinion.

Upon the completion of the plaintiff's case in chief, Mr. Krasna resumed the witness stand. He testified that when he started to write the play "Who Was That Lady?" in 1956, the source thereof was the story he had been telling at various times since 1939 and 1940. While he was an officer of Wald-Krasna Productions, Inc., he never authorized Jerry Wald to receive any stories or story ideas for him personally or to submit any stories or story ideas to him personally.

Edward Buzzell testified that he was a motion picture director and had been for over 30 years. On the occasion of a trip to Europe with Mr. Krasna in 1939, Mr. Krasna told him a story that he was developing which involved the idea of a submarine and the "FBI." That story was in substance the story that was presented in the play "Who Was That Lady?"

Louis Shurr testified that he had represented Bob Hope for approximately 30 years. In 1940 he sent a telegram to Mr. Krasna, who was in New York on his honeymoon, inquiring if he had an idea or a story for a motion picture for Bob Hope. Later he and Bob Hope had a meeting at Mr. Krasna's home. Mr. Shurr testified that the play "Who Was That Lady?", which Mr. Shurr saw in New York in 1958, "had a great many situations similar to the one" Mr. Krasna told him in 1940, except that, as he recalled, "Mr. Hope was to play an entertainer who, through a situation, became involved with the FBI and became a spy story." In the play the "hero" was a scientist. In approximately 1954, there was a meeting at Mr. Hope's home at which the witness, Mr. Krasna and, he believed, Mr. Gordean were present. There was also a meeting at Bob Hope's dressing room at Paramount Studios to discuss the story that became "Who Was That Lady?"

With respect to the second trial the plaintiff contends that the trial court made prejudicial statements to the jury on the third day of the jury's deliberations. The jury had reported to the court that it was deadlocked. The court stated: "Ladies and gentlemen, I am going to make a further effort in this case and I want to have you make further effort in this case. The Court sees no reason why you jurors are not as competent and are not as able nor as likely to decide the disputed issues of fact in this case and to decide them right as the next jury that would be called upon to determine such issues. I do not want you to understand by what I say that you are going to be made to agree or that you are going to be kept out until you

do agree. I do want you to understand that it is your duty to make an honest and sincere attempt to arrive at a verdict. . . . It appears to the Court that the failure of the jury to come to any agreement may be due to a basic misunderstanding about what the nature of the law is that is applicable to the facts in this case. I, therefore, am going to re-read to you the instructions relating to matters of liability."

The court thereupon instructed the jury as to the applicable law, in the course of which the court stated: "Now, here I will make an addition to what I told you before. According to the claim which is made in this case, which the plaintiff must prove as an element of his case, in order to prevail, Mr. Davies must have submitted to Mr. Krasna the dramatic core in question on or about the 6th day of December, 1951 [the date as pleaded in the first cause of action]. The fact, if it be a fact— and the Court makes no comment on that one way or the other—that there may have been submitted to Mr. Davies, by Mr. Davies to Mr. Krasna this dramatic core or idea at some other date does not prove whether it was submitted on the 6th of December, 1951. It is for you to determine from the evidence whether or not there was a submission—that is to say, an offer, a transmission, a delivery, a conveyance—of the dramatic core to Mr. Krasna by Mr. Davies on or about the 6th day of December, 1951."

After further instructions had been given by the trial judge the following incident occurred: "JUROR No. 5: May I ask once again for further clarification, this date, December 6th, are you speaking of this date— THE COURT: Yes, I am . . . Future date does not have anything to do with it on the question of submission. . . . The question of submission is pegged to a particular date. It is that date upon which the implied contract is alleged to have been made. . . . Well, let me put it to you this way. I have to explain a little something to you about pleadings, I guess. JUROR No. 5: You gave us 2 or 3 sets of instructions at different times. One time the date was mentioned. Other times it was not mentioned. This did not help us. THE COURT: . . . A contract must be made on a particular date. . . . You cannot claim that a contract was made on one date and then attempt to recover upon the basis of evidence that, 'No, it wasn't made on that date. It was made on some other date.' You have to be specific. The specific claim by the plaintiff, Mr. Davies, is that there was the submission of the story containing the dramatic core, which I read to you, to Mr. Norman Krasna on December 6, 1951. The fact, if it were a

fact, that at some other or different date Mr. Krasna may have received the dramatic core from Mr. Davies is irrelevant. You must determine whether or not there was submitted to Mr. Norman Krasna by Mr. Davies on the 6th day of December, 1951, the dramatic core embodied in the drama and story 'Love Must Go On.' ''

Just before the jurors returned to the jury room for further deliberations at 3:50 p.m., the court stated: ''Now, to point out once again, ladies and gentlemen, I truly believe that with further deliberations in this case the jury can come to a verdict. I profoundly hope so. I do not have any wish to coerce any member of the jury in any particular, and I do not wish to be understood as saying that any of you should abandon any of your honest convictions about the meaning, the weight or the scope of the evidence for the mere purpose of reaching a verdict. But I do wish you to go back, discuss the case some more in the light of the amplified instructions of the Court in the hope that you will be able to reach a verdict. I hope so.'' At 4:10 p.m. the jury returned to the courtroom with a written verdict in favor of the defendant.

The plaintiff contends that the court committed prejudicial error in that the jurors were told that they had to determine whether or not Mr. Davies submitted the dramatic core of his story to Mr. Krasna on a precise date, the 6th day of December, 1951. However, as has been noted, the court had informed the jury a short time earlier that the plaintiff, in order to prevail, had to show that the dramatic core was submitted to Mr. Krasna *on or about* the 6th day of December, 1951. But aside from that fact, it is reasonable to conclude that reference to that date was understood by the jurors to have been made for the purpose of distinguishing the submission which was pleaded in the complaint as having occurred on or about December 6, 1951, and which was evidenced by Mr. Marin's letter to Mr. Wald dated December 6, 1951 (see footnote 2 of this opinion), from the submission of copies of Mr. Davies' story to Jerry Wald by the Famous Artists agency on February 14, 1952, and March 27, 1952, and from the furnishing of a copy to Mr. Krasna in 1954 by that agency. It cannot reasonably be said that the plaintiff suffered any prejudice by reason of the incident upon which the plaintiff's contention is based.

In the course of the further instruction of the jury on the occasion just noted, another incident occurred of which the plaintiff complains on this appeal. The incident was as follows

(italics being used to indicate the portion quoted in plaintiff's brief): "[THE COURT:] That is to say, that Mr. Krasna knew and Mr. Davies intended that Mr. Krasna know under the circumstances, even though they did not say those words expressly, that, 'If, Mr. Krasna, I disclose this idea to you,' or 'I hand you the manuscript, that if you use it, you must pay me for it;' that is what we mean by conditioned disclosure. . . . In short, one cannot have such an obligation against his will thrust upon him. It has to be a matter of contract, you see, and contract involves consent on both sides. JUROR No. 5: *Any verbal or written consent?* THE COURT: *It may be either one. It depends upon the circumstances.* You can have an express promise, as the Court pointed out to you, when somebody says, 'Yes, I do. I promise.' Or the, 'Yes, I do; I promise,' may be manifested by conduct. The most striking illustration is when a person nods his head up and down. That means 'yes.' But it doesn't have to be that explicit if, from all of the circumstances as you find them in the case, you find that Mr. Krasna knew of the condition and that he voluntarily accepted it."

When the language upon which the plaintiff places emphasis is read in the light of the statements of the court preceding and following such language, it is obvious that there is no basis for the plaintiff's claim of prejudice which is expressed in part as follows: "Not only did this completely confuse the jury between implied and express contracts, but, also, and quite clearly by this one fell swoop, at the last minute, and before this exhausted and emotional jury, the court effectively obliterated the entire basic concept of implied contract insofar as the minds of the jury were concerned."

▉ The court submitted three special interrogatories to the jury, but in no instance did the required number of jurors agree upon an answer. (Cf. *Bernson* v. *Bowman*, 182 Cal.App. 2d 697, 701-702 [6 Cal.Rptr. 455].) The interrogatories and the notations contained thereon when they were returned to the court at the time the general verdict was received are set forth in the footnote.[5] The jurors were polled as to the general

---

[5]"You are instructed to answer separately each and all of the following special interrogatories:

1. Did the defendant, Norman Krasna, conceive and create the dramatic core of the play 'WHO WAS THAT LADY I SAW YOU WITH?' prior to the date upon which Valentine Davies conceived the dramatic core of his story 'LOVE MUST GO ON'?

Yes _____
No _____ Split 6 to 6

verdict and as to the special interrogatories. The record does not disclose any objection on the part of the plaintiff with respect to the verdict or the interrogatories. No motion was made that any further deliberations be undertaken by the jury.

Under the circumstances disclosed by the record, the governing law is that which is stated in *Van Damme* v. *McGilvray Stone Co.*, 22 Cal.App. 191, at pages 193-194 [133 P. 995] :

"For the sole reason that the jury declined to find on the special interrogatory submitted by the court the appellant contends that it is entitled to a new trial.

"We are unable to agree with this contention. . . . If the defendant's counsel waived by his conduct or language the right to insist upon an answer to the question; or if he failed at the opportune time to object to the acceptance and recordation of the verdict, he cannot at this time be heard to complain. He contends that he had no knowledge prior to the recordation of the verdict that the jury had not found upon the particular interrogatory submitted. The record not only does not substantiate this position, but is directly contradictory thereof. . . . We are of the opinion that it would be immaterial whether he received this information before or after the announcement by the clerk of the formal recordation of the verdict. We are fully satisfied that the court retains entire control of the proceedings up to the time that the jury is finally discharged from further consideration of the case, and that had the jury been returned to the jury-room for further deliberation, as suggested by the court, after the formal announcement by the clerk that the verdict was recorded, no substantial error would have resulted, and neither side thereafter could have successfully predicated

---

2. Did Valentine Davies submit to defendant Norman Krasna his said dramatic core?

| | |
|---|---|
| Yes | 4 |
| No | 8 |

3. Did Norman Krasna make use of the said dramatic core of Valentine Davies in writing the play 'WHO WAS THAT LADY I SAW YOU WITH?'?

| | |
|---|---|
| Yes | 7 |
| No | 5 |

The special interrogatories agreed upon, signed and returned to the court on this 19 day of December, 1963.

[Signed] W. H. Wiles
Foreman"

error on the action of the court." (See *Benson* v. *Southern Pac. Co.*, 177 Cal. 777, 781 [171 P. 948]; 1 McBaine, California Trial and Appellate Practice (1950) § 667, p. 548; 48 Cal.Jur.2d, Trial, § 268, p. 275.) The failure of plaintiff's counsel to insist that the jurors be returned to the jury room to consider further the interrogatories is particularly significant in this case inasmuch as the lapse of time between the resumption of deliberations and the reaching of a verdict was so brief as to indicate that the jurors had not given further consideration to such interrogatories during that period of time.

The plaintiff asserts that, in giving certain instructions and in refusing others, the court "erroneously prevented plaintiff from advancing a proper theory of the case." We have examined the instructions given and refused and find no prejudicial error. The brief of the plaintiff contains assertions of error in rulings on evidence, but no citations of authorities in support of the contentions are made. ██ This court is not required to search for legal authority to sustain bald contentions so made. (See 3 Witkin, Cal. Procedure (1954) § 150, p. 2332.) No prejudicial error in such rulings has been shown.

██ The evidence at the second trial was of such a nature as to warrant the jury, as the trier of fact, in determining that the plaintiff had not sustained the burden of proof with respect to the facts necessary to establish the existence of a contract implied in fact between Mr. Davies and Mr. Krasna. The record does not disclose error which prejudicially affected that determination and this court is not free to interfere therewith.

It is therefore ordered:

1. That the judgment entered on December 20, 1963, is amended by adding a paragraph setting forth the order granting the nonsuit as to the second cause of action;

2. That in the interests of justice, and acting under the discretion granted this court by rule 2(c) of the California Rules of Court, the notice of appeal filed March 4, 1964, is declared to be a premature notice of appeal from the judgment as amended;

3. That the portion of the amended judgment granting a nonsuit as to the second cause of action is reversed;

4. That the portion of the amended judgment in favor of the defendant as to the first cause of action is affirmed; and

5. That each party shall bear his or her own costs on appeal.

(See *Shepardson* v. *McLellan, supra,* 59 Cal.2d 83, 90-91.)

Shinn, P. J., and Frampton, J. pro tem.,* concurred.

Respondent's petition for a hearing by the Supreme Court was denied December 7, 1966. Mosk, J., did not participate therein.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.