[Civ. No. 30054. Second Dist., Div. Four. Aug. 11, 1967.]

CLYDE WARE, Plaintiff and Appellant, v. COLUMBIA BROADCASTING SYSTEM, INC., et al., Defendants and Respondents.

Simon & Leanse, David Leanse and Irwin O. Spiegel for Plaintiff and Appellant.

Baerwitz & Gordon and Robert E. Gordon for Defendants and Respondents.

FILES, P. J.—This is an action for breach of an alleged contract and for plagiarism of an unpublished play which plaintiff had written for television. The complaint also seeks damages for failure to give plaintiff screen credit as the author when the work was broadcast.

The background facts essential to this appeal may be stated briefly. Plaintiff's work, which is a complete play, in the form of dialogue and staging directions, 35 pages in length, entitled "The Thirteenth Mannequin," was submitted to the defendants (or some of them) for sale. The play was read and rejected. Subsequently defendants produced and telecast on the "Twilight Zone" series a play entitled "Miniature."

The defendant made a motion for summary judgment upon the ground, among others, that there was no substantial similarity between the plaintiff's work and the defendants' play. The motion was granted, and the action was dismissed. Plaintiff is appealing from the judgment.

Both plays are before the court as a part of the record, and the members of the court have viewed a screening of "Miniature."

Plaintiff's story is about a character called "old man" who lives with his daughter, Louise, and son-in-law, Bill, and works as a night watchman in a department store which has a display of 12 mannequins, grouped and costumed as members of a community. The old man spends his working time talking to these figures as his "friends." Louise and Bill are, in the author's words, "a pair any of us would very much like to have as our next-door neighbors." They are kind to the old man, but are worried about his mental health. After he has gone to work, they decide something must be done, so Bill phones the store to tell the old man that he is to see a doctor in the morning. The old man understands what is intended. He proceeds to consult with his "friends," the mannequins. In the morning his body is found on the floor. A few minutes later workmen bring in a new mannequin, a grandfather figure "extremely reminiscent of the old man." The final scene shows the new mannequin smiling.

The protagonist of defendants' play, "Miniature," is

"Charley," 35 years of age, unmarried, a friendless and bitter failure, residing with a mother who is both demanding and overprotective. Charley makes a habit of visiting a museum, where a glass case contains a miniature cross section of an 1890 town house, complete with furnishings. A figure of a beautiful young woman is seated at the spinet. As Charley watches, the doll plays the piano, moves about and carries on a variety of activities typical of a young lady in her home. We know from the comments of the museum guard that the doll is immovable, and that Charley is hallucinating. When Charley sees a mustachioed caller assault the lady, Charley goes into a frenzy and breaks the case. He is forcibly removed and then hospitalized for psychiatric treatment. After his release from the hospital, Charley again visits the museum. In the closing scene the guard discovers the figure of Charley seated alongside the girl in the glass case, holding a stereopticon in front of his face. As the guard watches, the Charley figure lowers the instrument, revealing his face.

## Plagiarism

Inasmuch as plaintiff's work has never been published and has not been copyrighted under the federal act, it is protected from infringement under state law. Civil Code section 980 provides: "(a) The author or proprietor of any composition in letters or art has an exclusive ownership in the representation or expression thereof as against all persons except one who originally and independently creates the same or a similar composition."

Neither state law nor the federal statute prohibits anyone from borrowing another's theme or ideas, as such. Copyright protection extends only to the representation or expression of those ideas. (*Desny* v. *Wilder* (1956) 46 Cal.2d 715, 732 [299 P.2d 257]; *Weitzenkorn* v. *Lesser* (1953) 40 Cal.2d 778, 789 [256 P.2d 947]; *Nichols* v. *Universal Pictures Corp.* (2d Cir. 1930) 45 F.2d 119, 121; *Fendler* v. *Morosco* (1930) 253 N.Y. 281 [171 N.E. 56].)

In the case at bench, what the two works have in common is the theme or idea of a man who finds happiness with an inanimate figure, whom he treats as a real person. This theme is at least as old as Ovid's myth of Pygmalion and Galatea.[1] Such a theme could not be the private property

---

[1] According to Edith Hamilton, Pygmalion was a gifted young sculptor and a woman hater. Being devoted to his art, he created a statue of a

or monopoly of any author. Of course a play based upon the myth, or upon any other theme which is a part of the public commons, may consitute literary property. The playwright delineates characters, establishes character relationships, and creates a sequence of scenes, incidents and actions, all portrayed in the dialogue and stage directions of the play. This creation becomes the author's property, and is protected by copyright.[2]

When we examine the defendants' television play, "Miniature," we find in it nothing of what plaintiff created in "The Thirteenth Mannequin." The characterizations, character relationships, scenes, incidents and dialogue are all markedly different. The protagonist in "Mannequin," the old man, is essentially a friendly, happy person, affected only by an apparently normal onset of senility. He loves his family and they love him. There is an affectionate relationship with the only other character in the play who meets him—the young man whom the old man relieves as watchman. If the old man can be described as lonesome, it is because he has outlived his contemporaries and because he has a lonely job. The mannequins are, in effect, his office friends. He talks to them, but they are not shown moving or speaking. This is a man in second childhood, playing with dolls. It is more like whimsy than psychosis.

Defendants' Charley is definitely psychotic. The story discloses the failure of his interpersonal relationship with his fellow workers, his employer, his mother, a sister, and a seductive girl friend. As the psychiatrist explains, "He was unable to cope with this world, so his mind created another world."

The mood of the defendants' play, and its dramatic development, are entirely different from plaintiff's. Although the death of the old man and the arrival of the grandfather mannequin are presented in plaintiff's play as mysterious

woman, more beautiful than any living person. Then he fell in love with the statue. He kissed and caressed her, clothed her and brought her gifts, and was utterly wretched because she could not respond. As a favor, the goddess Venus brought the statue to life. Pygmalion named the woman Galatea and married her. (Edith Hamilton, Mythology (Mentor ed. 1953), p. 108.)

[2]Two opinions by Judge Learned Hand afford a particularly illuminating analysis of the distinction between what is protected in a dramatic composition and what is not: *Nichols* v. *Universal Picture Corp.* (2d Cir. 1930) 45 F.2d 119 (no infringement) and *Sheldon* v. *Metro-Goldwyn Pictures Corp.* (2d Cir. 1936) 81 F.2d 49 (infringement found).

events, there is nothing there which cannot be accepted as natural phenomena except the closing smile on the face of the mannequin. This is only a bit of titillating foolishness, rather than a display of the supernatural. In defendants' play, what Charley sees in the museum can never be reconciled with the world of nature. Where the plaintiff presents happy fantasy, defendants' theme is morbid unreality.

Plaintiff's brief lists a number of claimed parallels between the two plays. Some of them relate to the single idea common to both plays, the Pygmalion-Galatea situation. Other parallels are constructed by emphasizing trivia and overlooking substance. Two examples will suffice.

Plaintiff argues "In each play the protagonist is in conflict with a family member with whom he lives." In "Mannequin," the son-in-law, Bill, expresses to his wife his irritation when the old man keeps the television too loud, but he never lets the old man know. It is Bill who decides that the old man must see a doctor and, inferentially, be placed in an institution. Bill's decision is a kindly one, and the old man understands this, even though he does not want to go. There is no animosity among any of the characters in "Mannequin." Certainly there is in that play no conflict which is remotely comparable to the pathological tension which constitutes the principal driving force in "Miniature."

Plaintiff argues that "In each play there is a worker who is privy to the relationship of the protagonist with his created people." In "Mannequin," the "worker" is the early evening watchman whom the old man relieves when he comes to work. This character, who is seen once at night and again in the morning after the old man dies, illustrates the old man's capacity for friendship with ordinary people—a quality which marks an important contrast with the characterization of defendants' Charley.

The "worker" in "Miniature" is the museum guard, a hostile figure who ridicules the protagonist, Charley, and eventually arrests him. The guard serves the important plot function of telling us that the doll does not move, thus assuring us that what Charley sees is his own hallucination, not a mechanical trick or a supernatural event. The role of the guard is in no substantial respect a counterpart of the role of the young man in plaintiff's work.

Since the trial court correctly determined, from an examination of the two plays, that there was no substantial similar-

ity between defendants' play and the protectible material in plaintiff's script, the defendants' motion was properly granted with respect to the plagiarism claim.

### Breach of Contract

Disposition of the contract claim involves other considerations. The complaint alleges in separate counts that plaintiff and defendants entered into an express oral contract, an implied agreement, and an agreement based upon trade customs. Since the defendants' affidavits do not conclusively demonstrate the absence of such agreements, we must assume on this appeal that the contracts were made as alleged.

In *Desny* v. *Wilder* (1956) 46 Cal.2d 715, 733 [299 P.2d 257], the court pointed out that the conveyance of an idea may be valuable and may be the consideration for a promise to pay, even though the idea itself is not private property, and even though that which was conveyed could have been obtained elsewhere without any payment. The court said (at p. 744) : ''It is not essential to recovery that plaintiff's story or synopsis possess the elements of copyright protectibility if the fact of consensual contract be found.'' In the *Desny* case the plaintiff submitted a three-page synopsis of a proposed motion picture to be based upon actual events which had been well publicized in newspapers and magazines. Defendants made a motion picture based upon the same events. The court held it was a factual issue whether defendants had actually used the plaintiff's synopsis and had thereby incurred an obligation to pay for it.

The record here is significantly different from the *Desny* record. ■■ Plaintiff here attached to his complaint not a mere synopsis but a complete dramatic work. The complaint alleges that he submitted it to defendants ''with the express oral understanding and agreement that in the event plaintiff's said literary property was thereafter used or telecast by said defendants, or any of them, in whole or in part, defendants would pay plaintiff the reasonable value of such use or telecast.'' Each of the other contract counts alleges similarly that the matter offered was plaintiff's ''literary property.'' Plaintiff does not allege that the parties contracted with respect to any idea, synopsis, or format. Literary property is what plaintiff had for sale; that is what he submitted to defendants, and that is the subject matter of his complaint. The consistent use of the term ''literary property'' in the com-

plaint does not appear to have been an inadvertence of the pleader. There is nothing in the record to suggest that plaintiff was, like Desny, offering to sell a public domain story idea. It would have been fatuous for plaintiff to have alleged that when his story was submitted defendants agreed, by implication, to pay him if they ever in the future made a picture embodying any stock situation which plaintiff had drawn upon in constructing his play. Plaintiff has not so alleged, and we therefore need not decide whether such a claim could be maintained under the *Desny* rationale.

The other implied contract cases relied upon by plaintiff are distinguishable upon the same basis. In *Weitzenkorn* v. *Lesser* (1953) 40 Cal.2d 778 [256 P.2d 947], the plaintiff submitted what was described in the complaint as a "composition." The case involved only a ruling upon a demurrer, and it was decided upon the theory that the plaintiff was alleging, among other things, that defendants had agreed to pay for her composition regardless of its protectibility. (See 40 Cal.2d at p. 792.)

In *Kurlan* v. *Columbia Broadcasting System, Inc.* (1953) 40 Cal.2d 799 [256 P.2d 962], the plaintiff was trying to sell "a new and original program idea" as well as a sample script.

In *Colvig* v. *KSFO* (1964) 224 Cal.App.2d 357 [36 Cal.Rptr. 701], the alleged contract related to an idea, format and title for a radio series, none of which was copyrightable. No sale of literary property was alleged.

In *Johnston* v. *20th Century-Fox Film Corp.* (1947) 82 Cal.App.2d 796 [187 P.2d 474], the subject of the contract was a book title, which is not protected by copyright.

In *Yadkoe* v. *Fields* (1944) 66 Cal.App.2d 150 [151 P.2d 906], the plaintiff supplied jokes at the request of the defendant. Under the circumstances, the defendant's obligation to pay was not dependent upon whether the material was literary property.

*Davies* v. *Krasna* (1966) 245 Cal.App.2d 535 [54 Cal.Rptr. 37] involved a claim that a "central theme and dramatic core concept" had been entrusted to defendant, in confidence, and that defendant used this disclosure in violation of that confidence. There again, the alleged transaction was not a sale of literary property as such.

The record before us shows that plaintiff submitted literary property to defendants, but an examination of the plaintiff's

work and the defendants' telecast establishes as a matter of law that defendants did not use plaintiff's property. Thus under the terms of the contract as pleaded, defendants are not obligated to plaintiff.

The judgment is affirmed.

Jefferson, J., and Kingsley, J., concurred.