**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

AARON BENAY; MATTHEW BENAY,
individually,
       *Plaintiffs-Appellants,*

v.

WARNER BROS. ENTERTAINMENT,
INC., a Delaware corporation;
RADAR PICTURES, INC., a California
corporation; BEDFORD FALLS
PRODUCTIONS, INC., a California
corporation; EDWARD ZWICK, an
individual; MARSHALL HERSKOVITZ,
an individual; JOHN LOGAN, an
individual,
       *Defendants-Appellees.*

No. 08-55719

D.C. No.
2:05-cv-08508-PSG-
FMO

OPINION

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted
October 8, 2009—Pasadena, California

Filed June 9, 2010

Before: William A. Fletcher and Richard R. Clifton, Circuit
Judges, and James K. Singleton,* Senior District Judge.

Opinion by Judge William A. Fletcher

*The Honorable James K. Singleton, Senior United States District
Judge for the District of Alaska, sitting by designation.

## COUNSEL

Sylvia Havens, Los Angeles, California, for the appellants.

George R. Hedges, Gary E. Evans, QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP, Los Angeles, California, Jaime Wayne Marquart, Daryl Marc Crone, BAKER MARQUART CRONE & HAWXHURST, LLP, Los Angeles, California, for the appellees.

## OPINION

W. FLETCHER, Circuit Judge:

Plaintiffs are two brothers, Aaron and Matthew Benay, who wrote and copyrighted a screenplay, *The Last Samurai* ("the

Screenplay"). The Benays contend that the creators of the film *The Last Samurai* ("the Film") copied from the Screenplay without permission. They sued Warner Brothers Entertainment, Inc., Radar Pictures, Inc., Bedford Falls Productions, Inc., Edward Zwick, Marshall Herskovitz, and John Logan (collectively "Defendants"), who wrote, produced, marketed, and/or distributed the Film. *Inter alia*, the Benays alleged copyright infringement under federal law and breach of contract under California law.

The district court granted summary judgment to Defendants on the copyright and breach of contract claims. We affirm on the copyright claim. We reverse and remand on the breach of contract claim.

## I.   Background

The Benays wrote their Screenplay between 1997 and 1999. They registered it with the Writers Guild of America in 1999 and with the federal copyright office on February 23, 2001. The Benays' agent, David Phillips, "pitched" the Screenplay to the president of production at Bedford Falls, Richard Solomon, on the telephone sometime between May 9, 2000, and May 12, 2000. Phillips provided a copy of the Screenplay to Solomon on May 16, 2000. According to Phillips, he provided the Screenplay with the implicit understanding that if Bedford Falls used it to produce a film, the Benays would be appropriately compensated. Solomon informed Phillips after receiving the Screenplay that Bedford Falls had decided to "pass" because it already had a similar project in development.

The Benays point to circumstantial evidence that, in their view, indicates that important aspects of the Film were copied from the Screenplay. Defendants contend that the Film was developed independently of the Screenplay. The Screenplay and the Film are similar in some respects and dissimilar in others.

The protagonist in the Screenplay is James Gamble, a successful West Point professor with a beautiful wife and a five-year-old son. Gamble travels to Japan at the request of President Grant. Gamble owes a debt to the President because then-General Grant saved Gamble's career after he accidentally killed eight of his own men during the Civil War. Gamble is initially successful in training and leading the Japanese Imperial Army, which is victorious in its first battle against the samurai. However, that battle turns out to be a strategic blunder because it incites a full samurai rebellion led by a treacherous samurai named Saigo. Gamble's five-year-old son is killed during Saigo's attack on a Christian church service. The death of his son leads Gamble to launch an attack against Saigo, which results in a devastating loss for the Imperial Army. Gamble falls into an opium-aided stupor, in which he is haunted by his failure, his mistake during the Civil War, and the death of his son. Gamble eventually is pulled out of this crisis by his wife and by Masako, a female samurai warrior who has double-crossed Saigo. The remainder of the Screenplay consists of Gamble's campaign to exact revenge. A series of battles unfolds between the Imperial Army, led by Gamble, and the samurai rebels. The conflict eventually ends with Gamble killing Saigo in a sword fight with the help of Masako, who dies in the fight. Gamble returns to the United States, where he lives in a Japanese-style house with his wife and a newborn child named Masako.

The protagonist in the Film is Nathan Algren, an unmarried alcoholic. He is haunted by his role in an attack on an innocent tribe during the Indian Campaigns. He has just been fired from his dead-end job hawking Winchester rifles when he is recruited by his former commander to train the Japanese Imperial Army in modern warfare. He travels to Japan as a mercenary. After Algren is captured by the samurai at the end of a disastrous first battle, he is exposed to traditional samurai culture. Algren bonds with Katsumoto, the honorable leader of the samurai rebellion, and falls in love with Taka, the widow of a samurai Algren killed while fighting for the Impe-

rial Army. Algren assimilates into a samurai village, eventually joining the samurai in a final futile battle against the modernized Imperial Army. After the samurai army is devastated, Algren confronts the young Emperor and teaches him the value of traditional samurai culture before returning to live with Taka in the samurai village.

The Benays filed suit on December 5, 2005, exactly two years after the public release of the Film. They asserted claims of copyright infringement under federal law, and breach of contract, breach of confidence, and intentional interference with prospective economic advantage under California law. Only the copyright and breach of contract claims survived to the summary judgment stage. The district court granted summary judgment to Defendants on both claims.

The Benays timely appealed the grant of summary judgment.

## II.  Standard of Review

We review *de novo* the district court's grant of summary judgment, viewing the evidence in the light most favorable to the non-moving party to determine the presence of any issues of material fact. *See Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1044 (9th Cir. 1994).

## III.  Discussion

### A.  Copyright Claim

**[1]** To prevail on their copyright infringement claim, the Benays "must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.' " *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). Defendants do not deny that the Benays own a valid copyright, but

they deny having copied from the Screenplay. The issue before us on appeal is whether there is substantial similarity between protected elements of the Screenplay and comparable elements of the Film. *See id.* ("Absent evidence of direct copying, proof of infringement involves fact-based showings that the defendant had access to the plaintiff's work and that the two works are substantially similar." (quotation omitted)).

" 'When the issue is whether two works are substantially similar, summary judgment is appropriate if no reasonable juror could find substantial similarity of ideas and expression.' " *Id.* (quoting *Kouf*, 16 F.3d at 1045). Substantial similarity is a fact-specific inquiry, but it " 'may often be decided as a matter of law.' " *Id.* (quoting *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.* ("*Krofft*"), 562 F.2d 1157, 1164 (9th Cir. 1977)). "Indeed, '[w]e have frequently affirmed summary judgment in favor of copyright defendants on the issue of substantial similarity.' " *Id*. at 1077 (quoting *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990)).

**[2]** "The Ninth Circuit employs a two-part test for determining whether one work is substantially similar to another." *Shaw*, 919 F.2d at 1356. To prevail in their infringement case, the Benays must "prove[ ] *both* substantial similarity . . . under the 'extrinsic test' and substantial similarity . . . under the 'intrinsic test.' " *Id.* (emphasis in original). "The 'extrinsic test' is an objective comparison of specific expressive elements." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). "The 'intrinsic test' is a subjective comparison that focuses on 'whether the ordinary, reasonable audience' would find the works substantially similar in the 'total concept and feel of the works.' " *Id.* (quoting *Kouf*, 16 F.3d at 1045). On a motion for summary judgment, we apply only the extrinsic test. The intrinsic test is left to the trier of fact. *See Swirsky v. Carey*, 376 F.3d 841, 844-45 (9th Cir. 2004); *Funky Films*, 462 F.3d at 1077. If the Benays fail to satisfy the extrinsic test, they cannot survive a motion for summary

judgment. *See Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1448-49 (9th Cir. 1988).

**[3]** "The extrinsic test is an objective test based on specific expressive elements: the test focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works." *Kouf*, 16 F.3d at 1045 (quotation omitted). "A court must take care to inquire only whether the protect[able] elements, standing alone, are substantially similar." *Cavalier*, 297 F.3d at 822 (emphasis and quotation omitted). "Copyright law only protects expression of ideas, not the ideas themselves." *Id.* at 823. "Familiar stock scenes and themes that are staples of literature are not protected." *Id.* "Scenes-a-faire, or situations and incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement." *Id.* Historical facts are also unprotected by copyright law. *Narell v. Freeman*, 872 F.2d 907, 910-11 (9th Cir. 1989).

**[4]** Under the "inverse ratio" rule, if a defendant had access to a copyrighted work, the plaintiff may show infringement based on a lesser degree of similarity between the copyrighted work and the allegedly infringing work. *See Shaw*, 919 F.2d at 1361 (citing 2 M. Nimmer, Nimmer on Copyright § 143.4, at 634 (1976)); *see also Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003). For purposes of the Benays' copyright claim, we assume without deciding that the inverse ratio rule applies to lower the burden on the Benays to show similarity. Even if the Defendants had access to the Screenplay, the Benays have not shown sufficient similarity between the Screenplay and the Film to maintain an infringement claim under federal copyright law.

The Benays point to a number of similarities between the Screenplay and the Film. Both have identical titles; both share the historically unfounded premise of an American war veteran going to Japan to help the Imperial Army by training it in the methods of modern Western warfare for its fight against

a samurai uprising; both have protagonists who are authors of non-fiction studies on war and who have flashbacks to battles in America; both include meetings with the Emperor and numerous battle scenes; both are reverential toward Japanese culture; and both feature the leader of the samurai rebellion as an important foil to the protagonist. Finally, in both works the American protagonist is spiritually transformed by his experience in Japan.

We agree with the district court that "[w]hile on cursory review, these similarities may appear substantial, a closer examination of the protectable elements, including plot, themes, dialogue, mood, setting, pace, characters, and sequence of events, exposes many more differences than similarities between Plaintiffs' Screenplay and Defendants' film." The most important similarities involve unprotectable elements. They are shared historical facts, familiar stock scenes, and characteristics that flow naturally from the works' shared basic plot premise. Stripped of these unprotected elements, the works are not sufficiently similar to satisfy the extrinsic test.

## 1.   Plot and Sequence of Events

In applying the extrinsic test, we look "beyond the vague, abstracted idea of a general plot." *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985). Though the Screenplay and the Film share the same basic plot premise, a closer inspection reveals that they tell very different stories.

In both the Screenplay and the Film, an American war veteran travels to Japan in the 1870s to train the Imperial Army in modern Western warfare in order to combat a samurai uprising. Not surprisingly, the stories share similar elements as a result of their shared premise. In both, the protagonist starts in America and travels to Japan where he meets the Emperor, who is struggling to modernize Japan. Both protagonists introduce modern warfare to the Imperial Army, using

contemporary Western weaponry and tactics. Both works feature a Japanese foil in the form of the leader of the samurai rebellion. And in both works the protagonist suffers a personal crisis and is transformed as a result of his interaction with the samurai.

**[5]** Despite these similarities, the two narratives are strikingly different. We agree with the district court's characterization:

> Plaintiffs' protagonist, Gamble, emerges from domestic security, to despair at the loss of his son, to revenge and triumph when he defeats his ruthless antagonist, Saigo. In contrast, the protagonist in Defendants' film moves from isolation and self-destructive behavior, to the discovery of traditional values and a way of life that he later comes to embrace. Thus, unlike Plaintiffs' Screenplay, which is largely a revenge story, Defendants' film is more a captivity narrative reminiscent in some respects to *Dances With Wolves*.

(quotation omitted).

**[6]** While the works share a common premise, that premise contains unprotectable elements. For example, there actually was a samurai uprising in the 1870s, the Satsuma Rebellion, led by Saigo Takamori, who is sometimes referred to as "The Last Samurai." *See* Charles L. Yates, *Saigo Takamori in the Emergence of Meiji Japan*, 28 Mod. Asian Stud. 449, 449 (1994); Kenneth G. Henshall, A History of Japan: From Stone Age to Superpower 78 (Palgrave Macmillan 2d ed. 2004) (1999). While there is no clear historical analogue to the American protagonist who travels to Japan to help fight the samurai rebellion, it is not surprising that a Hollywood film about the rebellion would insert an American character.

**[7]** This case is similar to *Funky Films*, in which the two works at issue told the story of a small funeral home operated

by two brothers after the sudden death of their father. 462 F.3d at 1077. The works shared numerous similarities: in both works the older brother moved home from a distant city, was creative in contrast to his conservative younger brother, and initially had no interest in becoming involved in the family business; in both the business was financially fragile; in both a rival funeral home attempted to take over the home but failed; and in both the younger brother changed his church affiliation in order to increase their client base. *Id.* at 1077-78. However, closer examination of the works revealed one to be essentially a murder mystery and the other to be a study of "the way the characters struggle with life in the wake of the cataclysmic death of [their] father." *Id.* at 1078 (emphasis omitted). We therefore held that the plots developed "quite differently" and rejected the plaintiffs' copyright claim. *Id.* Similarly, the Screenplay and Film in the case now before us tell fundamentally different stories, though they share the same premise and a number of elements that follow naturally from that premise.

### 2.   Characters

The Benays point to similarities between various characters in the two works, most notably the American protagonists. But on close inspection there are only a few similarities that have significance under copyright law. Most of the similarities are either derived from historical facts or are traits that flow naturally from the works' shared premises. *See Olson*, 855 F.2d at 1451-53 (noting that only distinctive characters are protectable, not characters that merely embody unprotected ideas).

[8] The most similar characters in the two works are the American protagonists, but the differences between them at least equal the similarities. The Benays' protagonist, Gamble, begins the Screenplay as a happily married and successful West Point professor, while the Defendants' protagonist, Algren, begins the Film as an unmarried loner, a drunk, and

a failure, with a meaningless job selling Winchester rifles; Gamble's flashbacks are to his accidental killing of eight of his own men during a Civil War battle, while Algren's are to his role in a brutal attack on an innocent Indian tribe; and Gamble gains an appreciation of Japanese culture and honor but returns to America at the end of the Screenplay, while Algren fully assimilates into the samurai way of life by the end of the Film.

**[9]** Although both works include the leader of the samurai rebellion as a central character, he is based on a historical figure, Saigo Takamori, and is therefore unprotected for copyright purposes. Moreover, the Screenplay's Saigo is a treacherous and ruthless warlord who deceives the Emperor, attacks a church service resulting in the death of Gamble's son, and is killed by Gamble at the end of the Screenplay. By contrast, the Film's Katsumoto is an honorable and spiritual samurai who respects the Emperor, fights only to preserve the honor of the samurai way of life, and becomes a friend and mentor to Algren by the end of the Film.

**[10]** The two works present the Japanese Emperor in starkly different ways. The Emperor in both works seeks to modernize Japan. The Screenplay's Emperor is confident, wise, and forward-looking. The Film's Emperor, on the other hand, is young and tentative, torn between modernization and traditional Japanese culture, and is bullied by his advisors.

**[11]** There are a number of important characters in the Film and the Screenplay who have no obvious parallel in the other work. In the Screenplay, Gamble's wife Britany and his son Trevor play an important role in the development of the plot. Trevor's death is the catalyst for Gamble's opium-aided breakdown and is the motivation for his revenge against Saigo. Gamble's relationship with his wife Britany is tested throughout the movie. The Screenplay also includes a character named Masako, a beautiful samurai warrior who betrays Saigo to help Gamble. In the Film, Algren is childless. He

falls in love with Taka, the widow of a samurai warrior. But Taka plays a very different role in the Film from the roles played by Britany and Masako in the Screenplay. Taka helps Algren assimilate into samurai culture and shares few character traits with Britany. Taka is graceful and giving, while Britany is fiery and strong-willed. Unlike Masako, Taka is not a warrior. In the Screenplay, Britany's father plays an important role in getting Gamble to Japan and is the central figure in a side-plot in which he attempts to break up Gamble's marriage. There is no parallel character or side-plot in the Film. Finally, the Film includes Algren's former commander during the Indian Campaigns, whom Algren despises. There is no parallel character in the Screenplay.

### 3.  Theme

**[12]**  The district court noted that "both works explore general themes of the embittered war veteran, the 'fish-out-of water,' and the clash between modernization and traditions." But to the extent the works share themes, those themes arise naturally from the premise of an American war veteran who travels to Japan to fight the samurai. Moreover, the works develop those themes in very different ways. The Screenplay exalts the Americanized modernization of Japan, expressed by Gamble triumphantly raising the American flag over Iwo Jima after killing Saigo. It characterizes samurai as part of an ugly class system from Japan's feudal past, and is largely positive about the role of westerners in modernizing Japan. By contrast, the Film is ambivalent toward modernization and is nostalgic for disappearing Japanese traditions. The Film treats the samurai tradition as an honorable way of life, sadly left behind by modernization, and treats westerners as self-interested and exploitative.

### 4.  Settings

**[13]**  Given that both works involve an American war veteran who travels to Japan to help the Emperor fight a samurai

rebellion, it is not surprising that they share certain settings: a scene of the protagonist sailing into Japan, scenes in the Imperial Palace, scenes on the Imperial Army's training grounds, and battle scenes in various places in Japan. These are all scenes-a-faire that flow naturally from the works' shared unprotected premise and are therefore disregarded for purposes of the extrinsic test. *See Cavalier*, 297 F.3d at 824 ("[T]his setting naturally and necessarily flows from the basic plot premise . . . [and] therefore . . . constitutes scenes-a-faire and cannot support a finding of substantial similarity.").

**[14]** Some of the settings are strikingly dissimilar. As the district court noted, the "American settings of the two works are drastically different." The Screenplay opens at West Point with a classroom scene, a snowball fight, and a scene in Gamble's comfortable home. The Film, on the other hand, opens at a San Francisco convention hall where the drunk Algren is hawking Winchester rifles. In Japan, the Screenplay includes scenes in samurai castles and in an opium den where Gamble has a spiritual crisis, none of which is in the Film. The Film includes extended scenes in a samurai village. No such village appears in the Screenplay.

### 5.   Mood and Pace

**[15]** Both works contain violent action scenes. But we agree with the district court that the Screenplay "has a triumphant mood" and "is a fast-paced adventure/intrigue story," while the Film "is more nostalgic and reflective in mood" and employs "leisurely sequences" in addition to its battle scenes. The two works have opposing perspectives on the modernization of Japan and the end of samurai culture. Further, the pacing of the two works is substantially different. The Screenplay jumps from battle scene to battle scene, while the Film has a long period of relative calm in which Algren is held in captivity in the samurai village.

### 6.   Dialogue

**[16]** There are limited similarities in dialogue between the two works. The Benays point to both works' use of the term "gaijin." But this word, which means "foreigner" or "stranger" in Japanese, naturally flows from the narrative of an American military advisor in Japan. *See Grosso v. Miramax Film Corp.*, 383 F.3d 965, 967 (9th Cir. 2004) (finding no substantial similarity where "the only similarities in dialogue between the two works come from the use of common, unprotectable poker jargon"). The Benays also point to the use of voice-overs by the protagonists in the two works. But the use of voice-overs is a common cinematic technique. A significant difference between the dialogues is that the Screenplay is written almost entirely in English (except for occasional words like "gaijin"), whereas the Film contains substantial exchanges entirely in Japanese. *Cf. Shaw*, 919 F.2d at 1358 (finding dialogue similar where "Plaintiffs' expert has set forth, side-by-side, dialogue from a variety of characters which almost match").

### 7.   Title

**[17]** A title standing alone cannot be copyrighted, but the copying of a title "may . . . have copyright significance as one factor in establishing" an infringement claim. *Shaw*, 919 F.2d at 1362 (quotation omitted). The Benays make much of the fact that the two works share the title "The Last Samurai." The Defendants respond that the identity of titles is not significant because Saigo Takamori, the historical figure on which much of the Film is based, is sometimes referred to as "The Last Samurai." *See* Charles L. Yates, *supra*, at 449. The limited copyright significance of the shared title in this case is insufficient to overcome the overall lack of similarities between protected elements of the works.

### 8.   Summary

**[18]** "At a very high level of generality, both works share certain plot similarities." *Funky Films*, 462 F.3d at 1081. "But

'[g]eneral plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind.' " *Id.* (quoting *Berkic*, 761 F.2d at 1293); *see also Cavalier*, 297 F.3d at 824 ("[B]asic plot ideas, such as this one, are not protected by copyright law."). A number of similarities between the works arise out of the fact that both works are based on the same historical events, take place at the same time and in the same country, and share similar themes. These similarities are largely between unprotected elements—historical facts, characteristics that flow naturally from their shared premise, and scenes-a-faire. *See Berkic*, 761 F.2d at 1293-94. Considering the Screenplay and the Film in their entireties, we conclude that the district court was correct in granting summary judgment to the Defendants on the Benays' federal copyright claim.

## B.    Breach of Contract Claim

The Benays assert a claim for breach of an implied-in-fact contract under California law. Contract law, whether through express or implied-in-fact contracts, is the most significant remaining state-law protection for literary or artistic ideas. Other previously important state-law protections, such as those against plagiarism, have been preempted by federal copyright law. *See* 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright ("Nimmer") § 19D.02 (Matthew Bender, rev. ed. 2009). Contract claims for protection of ideas are not preempted by copyright law because they "allege an 'extra element' that changes the nature of the action." *Grosso*, 383 F.3d at 968. That "extra element" is the agreement between the parties that the defendant will pay for the use of the plaintiff's ideas, independent of any protection offered by federal copyright law. *Id.*

**[19]** To establish a case for breach of an implied-in-fact contract based on the submission of their Screenplay, the Benays must establish that: (1) they submitted the Screenplay for sale to Defendants; (2) they conditioned the use of the

Screenplay on payment; (3) Defendants knew or should have known of the condition; (4) Defendants voluntarily accepted the Screenplay; (5) Defendants actually used the Screenplay; and (6) the Screenplay had value. *Mann v. Columbia Pictures, Inc.*, 128 Cal. App. 3d 628, 647 n.6 (Ct. App. 1982); *see also Faris v. Enberg*, 97 Cal. App. 3d 309, 318 (Ct. App. 1979).

It is settled law in California that novelty is not required for an implied-in-fact contract claim arising out of unauthorized use. *See Desny v. Wilder*, 46 Cal. 2d 715, 733 (1956) (disclosure of an idea may be protected by "contract providing that it will be paid for regardless of its lack of novelty" (quotation omitted)); *Chandler v. Roach*, 156 Cal. App. 2d 435, 441-42 (Ct. App. 1957). Defendants do not rely on any purported lack of novelty in the Benays' Screenplay. Instead, they contend that we should affirm the district court on any of three grounds. A grant of summary judgment may be affirmed on an alternative ground so long as that ground is fairly supported by the record. *See Security Life Ins. Co. of Am. v. Meyling*, 146 F.3d 1184, 1190 (9th Cir. 1998). The three grounds on which Defendants rely are: (1) the Benays cannot establish the requisite fifth element of their contract claim, actual use of the Screenplay by the Defendants; (2) the Benays failed to file their contract claim within two years of the breach of contract, as required by the California statute of limitations; and (3) there was no privity of contract between the Benays and any of the Defendants other than Bedford Falls. We decline to affirm on any of these three grounds.

### 1.   Actual Use of the Screenplay by Defendants

It is undisputed that defendants Edward Zwick and John Logan were working on a script entitled *West of the Rising Sun* before the Benays' Screenplay was pitched to Richard Solomon. In *West of the Rising Sun*, a Civil War veteran joins a samurai and helps him lead a cattle drive in Japan. On April 12, 2000, Zwick sent a fax to Logan in which he described the theme of *West of the Rising Sun*: "There's some nice political

intrigue: a cattle drive to a starving city as provocation for a civil war; a rich and modern metaphor in the introduction of an American passion (beef) and an American agenda (trade), to a culture that has lived happily for thousands of years without either." The Benays' agent pitched the Screenplay to Solomon about a month later, sometime between May 9 and 12, and delivered it to Solomon on May 16.

*West of the Rising Sun* eventually evolved into the Film, *The Last Samurai*. The Film differs from *West of the Rising Sun*, and resembles the Screenplay, in two particularly important respects. First, the Civil War veteran is no longer a transplanted American cowboy helping to lead a Western-style cattle drive; he is now a military expert helping to modernize the Japanese Imperial Army. Second, the veteran no longer comes to Japan to work side-by-side with the samurai; he now comes to Japan to fight against the samurai. The parties dispute when this evolution took place and what, if anything, the evolution owes to the Benays' Screenplay.

Defendants' argument on appeal is not based on a factual contention that defendants Zwick and Logan did not have access to, and therefore could not have used, the ideas in the Benays' screenplay in transforming *West of the Rising Sun* into the Film. Rather, Defendants contend that the Screenplay and the Film lack substantial similarity and that therefore, as a matter of law, the Benays cannot prove use of their Screenplay under California contract law.

**[20]** Similar to the inference of copying in copyright law, California contract law "permits actual use of a plaintiff's idea to be inferred from evidence of access and . . . . [T]his inference is not binding; defendant can rebut it through contrary evidence." 4 Nimmer § 19D.07[C]; *see Mann*, 128 Cal. App. 3d at 647-48. In breach of contract claims, the level of similarity that permits an inference of actionable use depends on the nature of the agreement between the parties. *See* 4 Nimmer § 19D.08. In cases of explicit contracts where the

terms of the agreement are spelled out, the level of similarity required depends on those terms. *See* 4 Nimmer § 19D.08[B] (comparing *Fink v. Goodson-Todman Enters.*, 9 Cal. App. 3d 996, 1008-13 (Ct. App. 1970) (where contract required payment for any work "based upon" the submitted work, court required substantial similarity between the works), with *Weitzenkorn v. Lesser*, 40 Cal. 2d 778, 792 (1953) (theoretically, parties could agree that the defendants must pay for any use "no matter how slight or commonplace the portion which they used"), and Jay S. Kenoff & Richard K. Rosenberg, "Form 9-3 Producer Multi-Picture Employment Agreement with Commentary," in *Entertainment Industry Contracts* (Donald C. Farber & Peter A. Cross eds., 2006) (form contract whereby studio agrees to pay for submitted ideas whether or not they are ultimately used)).

**[21]** Where the contract is implied-in-fact rather than explicit, the parties have not specified any standard. In such cases, "the weight of California authority is that there must be 'substantial similarity' between plaintiff's idea and defendant's production to render defendant liable." 4 Nimmer § 19D.08[A] (citing *Kurlan v. Columbia Broad. Sys., Inc.*, 40 Cal. 2d 799, 809 (1953); *Sutton v. Walt Disney Prods.*, 118 Cal. App. 2d 598, 603 (Ct. App. 1953); *Whitfield v. Lear* 751 F.2d 90, 93 (2d Cir. 1984)). The requirement of substantial similarity for implied-in-fact contract claims "aligns this field with copyright infringement . . . . [and] also means that copying less than substantial material is non-actionable." *Id.* "Courts have specifically rejected the contention that liability could be imposed on defendants on the basis of less than substantial similarities." *Id.*

**[22]** However, "[f]rom the invocation of the copyright term 'substantial similarity' it does not follow . . . that plaintiffs in idea-submission cases must prove substantial similarity of *copyright-protected* elements." *Id.* Rather, because the claim is based in contract, unauthorized use can be shown by substantially similar elements that are not protected under

copyright law. " 'There is nothing unreasonable in the assumption that a producer would obligate himself to pay for the disclosure of an idea which he would otherwise be legally free to use, but which in fact, he would be unable to use but for the disclosure.' " *Blaustein v. Burton*, 9 Cal. App. 3d 161, 183 (Ct. App. 1970) (quoting *Chandler*, 156 Cal. App. 2d at 441-42). Therefore, our holding (above) that the Screenplay and the Film are not substantially similar for purposes of copyright infringement does not preclude a finding of substantial similarity for purposes of an implied-in-fact contract under California law. *See Grosso*, 383 F.3d at 967 (affirming grant of summary judgment for defendants on copyright claim due to lack of substantial similarity, but remanding claim of breach of an implied-in-fact contract).

Defendants argue that because the Benays submitted a completed screenplay we must analyze their contract claim in the same manner as their copyright claim. Defendants' argument is counterintuitive. They concede that if the Benays had submitted in outline form the idea of an American Civil War veteran who helps modernize the Japanese Imperial Army and fights against the samurai, the Benays would be protected against unauthorized use under an implied-in-fact contract though not under copyright law. But they argue that because the idea was embodied in a completed screenplay, an implied-in-fact contract can provide no protection beyond that already provided by copyright law.

**[23]** California case law does not support the proposition that when a complete script is submitted under an implied-in-fact contract, only those elements of the script that are protected under federal copyright law are covered by the contract. In *Ware v. Columbia Broadcasting System, Inc.*, 253 Cal. App. 2d 489, 494-96 (Ct. App. 1967), the court of appeal was unwilling to find breach of an implied-in-fact contract where the only similarity between the plaintiff's completed script and the defendant's television episode was that the protagonists in both spoke to inanimate figures (a mannequin in

one and a miniature museum exhibit in the other) and in the end themselves became inanimate figures. *Id.* at 490-91. The court in *Ware* did not hold that a plaintiff who has submitted a completed script can have no contract-based protection of the ideas in that script beyond that afforded by copyright law. The court suggested that the outcome might have been different if the plaintiff had submitted only the basic idea of a protagonist who speaks with inanimate figures and then becomes such a figure. But the plaintiff in that case alleged an implied contract in which the use of an entire "literary property," rather than merely the use of a concept or idea, was offered for sale: "Plaintiff does not allege that the parties contracted with respect to any idea, synopsis, or format. Literary property is what plaintiff had for sale; that is what he submitted to defendants, and that is the subject matter of his complaint." *Id.* at 494.

In *Donahue v. Ziv Television Programs, Inc.*, 245 Cal. App. 2d 593, 597, 601 (Ct. App. 1966), the court of appeal held that actionable use existed if there were "enough similarities in basic plot ideas, themes, sequences and dramatic 'gimmicks' " between plaintiffs' submission of a "format in written form, together with twelve story outlines, one screenplay and a proposed budget," and defendants' television series. In *Desny*, the California Supreme Court reversed a grant of summary judgment for defendants after comparing elements of plaintiff's submitted synopsis to a synopsis of defendants' photoplay. 46 Cal. 2d at 746-50. In *Blaustein*, the court found a triable issue of fact as to use after comparing the defendants' movie with plaintiff's idea to film Shakespeare's "The Taming of the Shrew" in Italy, with Richard Burton and Elizabeth Taylor starring, Franco Zeffirelli directing, and various scenes cut from or added to the play. 9 Cal. App. 3d at 184.

In *Grosso*, we recognized that the analysis of similarity under an implied-in-fact contract claim is different from the analysis of a copyright claim, even where the plaintiff has submitted a full copyright-protected script. 383 F.3d at 967-

68. In that case, we affirmed summary judgment for the defendant on the copyright claim because we agreed with the district court that the defendants' movie was not substantially similar to the plaintiff's screenplay. *Id.* But despite this conclusion, we reversed the grant of summary judgment as to the implied-in-fact contract claim and remanded to the district court. *Id.*

**[24]** As noted above, the Screenplay and the Film share a number of similarities. Most notably, in both works, the protagonist is an embittered American war veteran who travels to Japan where he meets the Emperor, trains the Imperial Army in modern warfare, fights against the samurai, and in the end is spiritually restored. Both works are set at the time of the Satsuma Rebellion of 1877; both works rely heavily on the historical figure Saigo Takamori; and both works share the same title. These similarities are substantial for purposes of an implied-in-fact contract under California law.

**[25]** We emphasize that we do not here decide whether, and to what degree, these similarities are due to use of the Benays' Screenplay by Defendants. Suffice it to say that there may be evidence in the record from which a reasonable factfinder could find unauthorized use by the Defendants. We leave to the district court on remand the task of determining whether there was unauthorized use by Defendants of elements or ideas from the Benays' Screenplay.

## 2.    Statute of Limitations

**[26]** Defendants argue that the Benays filed their claim more than two years after their claim accrued, and that the claim is therefore barred by the statute of limitations. *See Blaustein*, 9 Cal. App. 3d at 185 (two year statute of limitations for implied-in-fact contract claims, under California Civil Procedure Code § 339). The Benays filed their claim exactly two years after the release of the Film. Therefore, if their claim accrued at any point before the Film's release, it

is time-barred. The district court rejected Defendants' argument that as a matter of law the statute of limitations began to run before the first public release of the film. We agree with the district court.

Defendants contend that the date of accrual depends on when the Benays became aware of Defendants' use of the Screenplay. Defendants argue that the Benays knew about the development of the Film before it was released, and that their claim therefore accrued before that date. However, the accrual date of an implied-in-fact contract claim "depends on the nature of [Defendants'] obligation, if any, to [the Benays]." *Blaustein*, 9 Cal. App. 3d at 185. In *Blaustein*, the court of appeal refused to find on a motion for summary judgment that the action was barred by the statute of limitations:

> A trier of fact might conclude that [the actionable] use was intended to occur the moment a preliminary script is written embodying [plaintiff's] idea, even if in fact no motion picture production, based upon such script, ever occurs. The court might also find that the implied promise to pay arose upon respondents' disclosure of the idea to a substantial segment of the public since such use would tend to destroy any further marketability of the idea.

*Id.* at 186.

**[27]** Because the parties' intent is difficult to ascertain in implied-in-fact contract cases, California courts generally assume that the accrual date is the date on which the work is released to the general public:

> [In] implied contract cases, the parties will not have defined the requisite use. Accordingly, in the absence of any reason to hold otherwise, only a use that "disclosed the idea to a substantial segment of the public" should be regarded as the kind of use

requiring payment. For only that type of use "would certainly destroy any further marketability of the idea."

4 Nimmer § 19D.07[D] (quoting *Thompson v. Cal. Brewing Co.*, 191 Cal. App. 2d 506, 510 (Ct. App. 1961)).

**[28]** In *Davies v. Krasna*, 14 Cal. 3d 502, 511-12 (1975), the California Supreme Court noted that "[a] suit for breach of an implied contract not to exploit an idea without paying for it does arise only with the sale or exploitation of the idea." 14 Cal. 3d at 511-12. In *Thompson*, the court of appeal held that extensive "test" advertising in San Diego and Sacramento started the running of the statute of limitations only because it "immediately disclosed the idea to a substantial segment of the public," which "would certainly destroy any further marketability of the idea." 91 Cal. App. 2d at 510. In *Donahue v. United Artists Corp.*, 2 Cal. App. 3d 794, 802 (Ct. App. 1969), the court of appeal wrote that "the private auditioning of a film to national advertising agencies" did not compare with "the exhibition of the idea to 'a substantial segment of the public in two metropolitan centers in this state,' " and therefore did not cause the action to accrue. The court held that the cause of action accrued at the later time, when the idea was exhibited to a "substantial segment of the public." *Id.*

### 3.   Privity of Contract

Finally, Defendants argue that there was privity of contract only between the Benays and Bedford Falls, and that the Benays' contract claim must therefore be dismissed as to all other defendants. Privity between the parties is a necessary element of an implied-in-fact contract claim. *See Rokos v. Peck*, 182 Cal. App. 3d 604, 617-18 (Ct. App. 1986); *Mann*, 128 Cal. App. 3d at 647 n.6. The Benays point out that Defendants did not make their privity-of-contract argument in the district court. The Benays therefore did not have an opportu-

nity to organize and present evidence in the district court in response.

We decline to reach the question whether there is privity of contract between the Benays and defendants other than Bedford Falls. We leave it to the district court to decide this question if and when it is properly presented by Defendants.

## Conclusion

We affirm the district court's grant of summary judgment for Defendants on the Benays' copyright infringement claim. We reverse the grant of summary judgment on the Benays' breach of contract claim and remand for further proceedings consistent with this opinion. We award costs on appeal to the Benays.

AFFIRMED IN PART AND REVERSED IN PART.